# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

_____

| | |
|---|---|
| **AEP MEMCO, LLC**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 03-2964-D |
| v. | ) |
| | ) |
| **WEPFER MARINE, INC.,** | ) |
| | ) |
| Defendant/Third Party Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| **TECO BARGE LINE, INC., and** | ) |
| **MEMPHIS MARINE SERVICE, INC.,** | ) |
| | ) |
| Third Party Defendants. | ) |

_____

## MEMORANDUM OPINION
_____

## I.  INTRODUCTION

Plaintiff AEP Memco, LLC, d/b/a Memco Barge Lines (hereinafter "Memco"), brought suit against Defendant Wepfer Marine, Inc. (hereinafter "Wepfer"), a corporation in the business of fleeting and mooring barges for hire.  Memco alleges that it sustained damages resulting from a barge breakaway at a fleet operated by Wepfer on the lower Mississippi River, and that Wepfer is responsible for such damage.  This is a claim of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.  Wepfer filed a third-party complaint against Teco Barge Line, Inc. (hereinafter "Teco") and Memphis Marine Service, Inc. (hereinafter "Memphis Marine") pursuant to the provisions of Rule 14(a) and (c) of the Federal Rules of Civil

1

Procedure, claiming Memco's damages were caused by the negligence of Teco and Memphis Marine. The Court conducted a bench trial on December 12-13, 2005, on the merits of the case. **After consideration of the testimony of the witnesses, the exhibits, and the briefs of the parties, the Court makes the following findings of fact and conclusions of law.**

## II.  FINDINGS OF FACT

1. At all relevant times, Memco was the owner and/or operator of the barges MEM 5122 and MEM 94157, and is the proper party to assert this claim for damages as a result of the breakaway. (Stipulation, Pretrial Order)

2. Pursuant to a contract between Wepfer and Memco, barges MEM 5122 and MEM 94157 were delivered to Wepfer in an undamaged, seaworthy condition to be fleeted by Wepfer. (Stipulation, Tr. 9.)

3. At all relevant times, Memco barges MEM 5122 and MEM 94157 were in the care, custody and control of Wepfer prior to the breakaway, thus creating a bailment relationship. (Stipulation, Tr. 11, 12.)

4. At all relevant times, Memphis Marine was the owner and/or operator of the M/V TOMMY ROSS, a 1,200 horsepower, twin screw towboat. (Stipulation, Pretrial Order)

5. At all relevant times, Teco was the owner and/or operator of the M/V GIRLIE KNIGHT, an 8,400 horsepower triple screw Mississippi River towboat. (Stipulation, Pretrial Order)

6. At all relevant times, the M/V BILL WEPFER and M/V WALT WEPFER were vessels owned by Wepfer and were operated at the Osceola fleet. (Stipulation, Pretrial Order)

7. The Osceola Landing Fleet comprises two separate fleets: (1) The Wepfer Marine Fleet, located along the west bank side of the Osceola chute, and (2) the Memphis Marine Fleet,

located along the east side of the Osceola chute, along the west side of Island No. 30. (Stipulation, Pretrial Order)

8.  Wepfer's Osceola fleet, where the barges in question were moored, is located at an inlet or chute at approximately mile 785 of the lower Mississippi River. (Tr. 28.) The chute is separated and protected from the main river channel, where the line boats[1] operate, by an island designated on river maps as "Island No. 30." (Def.'s Proposed Finding of Facts 3; Tr. 29.)

9.  Wepfer and Memphis Marine customarily allowed large line boats to back up into the chute and position themselves alongside the Island No. 30 bank in order to facilitate the fleet boats that bring barges to and build tows on the line boats. Both Wepfer and Memphis Marine routinely did tow work on line boats in the chute along Island No. 30 in the same location where the Memphis Marine vessel, the TOMMY ROSS, did tow work on the GIRLIE KNIGHT on the night in question. (Memphis Marine's Proposed Finding of Facts 5.)

10.  No one had ever told Captain Steven Griggs ("Captain Griggs") of the TOMMY ROSS not to do tow work in that location. (Tr. 273.)

11.  Boats exiting the fleet too fast can cause the water in the chute to move in the opposite direction from which it normally moves, which creates excessive wheelwash in the chute. (Tr. 218.) This wheelwash can move barges around, and tear them loose from their moorings. (Id. at 218-19.) Wheelwash from a line boat the size of the GIRLIE KNIGHT can produce surge in the chute at Osceola sufficient to cause enough movement to break the moorings of barges. (Tr. 88.)

12.  As a result of this phenomenon, Captain Griggs has instructed line boats leaving the chute to keep their engines "knuckled in," i.e. "at idle speed until they get clear of the chute to keep

---

[1] Towboats that push groups of barges over long distances.

from putting an excessive amount of thrust or water into the chute." (Tr. 220)  Clearing the chute means clearing the point at the bottom of Island No. 30 before "coming ahead", or using more power than idle, on its engines.  (Def.'s Proposed Finding of Facts 6.)

13. Captain Griggs believed that if a line boat is "knuckled in," the line boat's propellers will not put out any wheelwash which would cause the barges in the fleets to shift or move.  Griggs testified that he can tell if a line boat is "knuckled in" by observing whether the line boat is putting out any wheelwash.  If the line boat is putting out any wheelwash, then the line boat is proceeding at a speed greater than "knuckled in." (Memphis Marine Proposed Finding of Facts 18.)

14. If a line boat "blasts out" or proceeds out of the chute at full ahead, then the line boat's wheelwash will immediately disturb the barges in the Wepfer and Memphis Marine fleets and immediately cause them to shift and move around.  (Memphis Marine Proposed Finding of Facts 18.)

15. Captain Mark Terry ("Captain Terry") of the GIRLIE KNIGHT also testified that a line boat needs to be below Island No. 30 before coming ahead because coming ahead earlier can disturb barges in a fleet. (Tr. 403.)

16. Both Wepfer and Memphis Marine, realizing the risks associated with the presence of a line boat operating in the chute, developed a practice or "courtesy" of checking each other's fleets when a line boat would exit to make sure the moorings were not disturbed. (Def.'s Proposed Finding of Facts 8; Tr. 89, 235.)

17. In November 2002, Wepfer was using lock lines shackled into wires to moor barges in its fleet.  Memphis Marine was using wire cable instead of lines.  Griggs testified that four loaded barges placed too much strain on a lock line shackled into a wire.  Griggs further stated that

4

Memphis Marine would not moor any more than three barges with a wire line combination. If there was a tier with more than three barges, only wires would be used. (Pl.'s Proposed Finding of Facts 6; Tr. 253.)

18.     In November 2002, Wepfer customarily used both a head line and stern line to moor barges. (Tr. 36.) However, Charles Brodie ("Brodie"), Wepfer's fleet supervisor, admitted there were times when a head line and stern line were not used. (Tr. 38.)

19.     Both Brodie and StevenWhite, a Wepfer deck hand, testified that there was a head line and stern line on the four barge tier which broke away. (Pl.'s Proposed Finding of Facts 3; Tr. 36, 179.)

20.     However, neither Brodie nor White remember taking part in mooring the barges that broke away. (Tr. 179.)

21.     The regular practice for Wepfer in November 2002 for inspecting moorings after barges were placed in the fleet was a visual inspection, which was done on a daily basis. (Tr. 39.) If there was slack in the lines, a deck hand was sent to pull the slack out to keep the barges from moving around. (Tr. 39-40.)

22.     Brodie admitted that there were "two or three feet" of slack in the lines on November 15, 2002. (Tr. 139.)

23.     Ordinarily, Brodie liked to have loaded barges fleeted further up in the chute closer to the dock so that he could keep an eye on them, but he could not do that with the break away barges. There were approximately 40 barges in the Wepfer fleet, which is considered a full fleet. (Tr. 139-142, 254.)

24.     On the evening of November 15, 2002, barges MEM 5122 and MEM 94157 were

fleeted at the Wepfer Marine Fleet. (Stipulation, Pretrial Order)

25.     Brodie was in charge of the overall day-to-day management and operation of the Wepfer fleet, and his responsibilities included, but were not limited to, making sure the barges in the Wepfer fleet were moored properly at all times and were in good condition. (Tr. 20, 22-25, 40) At the time of the breakaway, Brodie had 35 years of experience on the river including 15 years as a fleet supervisor. (Tr. 18, 24.)

26.     On November 15, 2002, Brodie had inspected the moorings. He observed the shore line on the bow, the shore line on the stern, and the leave lines between the barges. (Tr. 67.) The lines appeared to be in good condition, having only been in service about two months. (Tr. 73-74.)

27.     On November 15, 2002, at 19:30, the Wepfer fleet boat BILL WEPFER finished tow work at the lower end of the Wepfer fleet, and then proceeded directly to the Wepfer dock located at the upper end of the Osceola chute. On the way, Brodie shined his fleet boat's spotlight on the barges in the Wepfer fleet to "visually check" their moorings. (Memphis Marine's Proposed Finding of Facts 13.)

28.     Following this inspection, Brodie went home for the night, leaving the BILL WEPFER at the dock in the hands of White, who was not licensed to operate the vessel. Wepfer customarily assigned a vessel crew member to stay with its harbor tug while docked to maintain a watch over the fleet. (Tr. 110.) On the night in question, White was the assigned crew member. (Tr. 182.)

29.     Because White could not operate the BILL WEPFER to check the barges in the Wepfer fleet, he had to remain at the dock. White checked the barges in the fleet by shining the fleet

boat's spotlight down onto the fleet periodically. At no time during the night of November 15, 2002, or the early morning of November 16, 2002, did White go out onto the barges moored in the Wepfer fleet to check the condition of the mooring lines. (Memphis Marine's Proposed Finding of Facts 13-14.)

30. On the night of November 15, 2002, both the GIRLIE KNIGHT and the TOMMY ROSS vessels performed tow work in the Osceola chute. (Tr. 196.)

31. The GIRLIE KNIGHT arrived at the Memphis Marine Services Fleet at 20:50 and departed the fleet at 22:30. (Tr. 304.)

32. Captain Terry and steersman Billy Watkins ("Watkins") were in the pilothouse of the GIRLIE KNIGHT. Watkins, a pilot trainee with two years experience, was operating the tow boat, while Terry remained in the pilothouse to supervise and observe Watkins' performance. (Memphis Marine's Proposed Finding of Facts 5; Tr. 323.)

33. The GIRLIE KNIGHT, and its tow of 24 barges, comprised a flotilla of over 1,200 feet long. (Def.'s Proposed Finding of Facts 7; Tr. 301-02.)

34. Upon arrival, Terry and Watkins shined the GIRLIE KNIGHT's spotlight along the Osceola Landing shoreline, and determined that the eddy, or counter current, was too strong at the outer end of the chute for the GIRLIE KNIGHT to work tow in that area. Watkins contacted the TOMMY ROSS and advised that the eddy was too strong. The TOMMY ROSS instructed Watkins that the GIRLIE KNIGHT should back up into the chute and get in position along the west bank shoreline of Island No. 30. (Id.)

35. The GIRLIE KNIGHT backed in slowly and eased up into the lower part of the Osceola chute, using the upstream eddy in the chute to position the GIRLIE KNIGHT and tow

alongside the Island No. 30 bank. The GIRLIE KNIGHT positioned itself so that the head of the tow stuck out from the end of Island No. 30. This would enable the TOMMY ROSS to bring two barges out to be placed on the starboard head of the GIRLIE KNIGHT's tow (Id. at 7.) Most of the 1,200 foot flotilla was backed into the chute against the bank of Island No. 30, across from Wepfer's fleet. (Def.'s Proposed Finding of Facts 7.)

36. The GIRLIE KNIGHT positioned itself by pushing its port stern barge against the bank – "scotching in" the port stern of the tow along the Island No. 30 bank – and at the same time, using the eddy to push and keep the tow in position against the Island No. 30 shoreline. (Teco's Proposed Finding of Facts 7.)

37. After "scotching" his tow against the bank, Watkins was able to utilize the effects of the eddy to keep the GIRLIE KNIGHT and tow in position against the Island No. 30 bank. "Once or maybe twice," Watkins "knuckled in" one engine in gear, either ahead or astern, as necessary to keep the tow in position; but otherwise, it was not necessary for Watkins to work the GIRLIE KNIGHT's engines in order to keep the flotilla in position while waiting on the TOMMY ROSS. Id.

38. While waiting on the TOMMY ROSS, Terry and Watkins observed a tier of 4 loaded barges across the chute and behind them in the Wepfer fleet swinging out away from the bank. These barges were moored to the bank with only a single head line. This tier of barges, however, settled back against the bank as the TOMMY ROSS approached. (Id. at 8.)

39. The GIRLIE KNIGHT waited one hour (20:50-21:50) in position along Island No. 30 bank before the TOMMY ROSS delivered the two loaded barges to the GIRLIE KNIGHT's tow at 21:50; during that interval, the GIRLIE KNIGHT remained stationary and in position against the

Island No. 30 bank. (Teco's Proposed Finding of Facts 8.)

40.     Upon completion of the tow work, Captain Griggs of the TOMMY ROSS called Watkins, and they agreed to a "log out" time of 22:30. The TOMMY ROSS then proceeded alongside the tow of the GIRLIE KNIGHT. (Id.)

41.     When the TOMMY ROSS was clear of the GIRLIE KNIGHT, the GIRLIE KNIGHT proceeded to get underway. Watkins engaged the GIRLIE KNIGHT's center engine "knuckled in" and proceeded to ease out of the chute at a slow rate of speed. In the "knuckled in" position, the GIRLIE KNIGHT's engines were barely in gear, and they were not putting out any wheelwash. (Teco's Proposed Finding of Facts 8-9.)

42.     Captain Terry testified that after the TOMMY ROSS put the barges in tow and the GIRLIE KNIGHT eased out of the chute with only its engines "knuckled in," the boat traveled below the point before Watkins increased the GIRLIE KNIGHT's speed to about 650 rpms, which was up from approximately 500 rpms at knuckle speed. (Pl.'s Proposed Finding of Facts 6; Tr. 400.)

43.     Captain Griggs testified that the GIRLIE KNIGHT did not put out any wheelwash when it departed the chute, and that the GIRLIE KNIGHT proceeded out of the chute "knuckled in." (Id.) If the GIRLIE KNIGHT had put out wheelwash, Captain Griggs testified that he would have seen some movement in the barges. (Tr. 249.)

44.     Implementing the "courtesy" practiced by Wepfer and Memphis Marine, Captain Griggs slowly cruised by the fleets using a spotlight to make sure barges were not moving around. Griggs did not see any movement of any of the barges in either the Wepfer or Memphis Marine fleets following the GIRLIE KNIGHT's departure from Osceola. (Memphis Marine Proposed Finding of Facts 19.) If a departing boat produces enough wheelwash to break properly fleeted

9

barges loose, this will usually happen immediately. (Tr. 274)

    45.    Captain Griggs also testified the barges that broke away were secured with only a single headline. (Memphis Marine Proposed Finding of Facts 22.) He did not see a stern line, which indicates that only one line was securing those barges to the bank. (Tr. 251.) If there are two lines– a head line and a stern line– then this minimizes the movement of barges. (Tr. 255.) But if there is only one line, any condition or phenomenon including wind, current, or wake from a passing water craft, can cause barges to move in either direction because of slack in the line. (Id.)

    46.    Griggs observed that the shore lines securing the barges that eventually broke away were "really slack.". (Tr. 258.) Griggs also testified that he told a Wepfer boat pilot that they would have less problems with their barges breaking away if they would pull all the slack out of their lines. (Tr. 259.)

    47.    On the night of November 15, 2002, the Mississippi River was "rising," which can cause slack in mooring lines (Teco's Proposed Finding of Facts 5.)

    48.    On November 15, 2002, Wepfer did not have any specific policy concerning the frequency and extent of inspection that the deck hand would make of the fleet while the fleet boat was moored at the dock. (Pl.'s Proposed Finding of Facts 4; Brodie Tr. 127-130; White Tr. 182.)

    49.    As the TOMMY ROSS and GIRLIE KNIGHT were building tow, White shined the BILL WEPFER spotlight down onto the Wepfer fleet and saw nothing unusual. After the GIRLIE KNIGHT departed from the Osceola chute, White again shined the BILL WEPFER's spotlight down onto the Wepfer fleet, and did not see any barges shifting or breaking away. (Memphis Marine's Proposed Findings of Facts 15.) He is unsure whether he shined his spotlight on those barges again before he learned the barges had broken away. (Pl.'s Proposed Findings of Facts 4, Tr. 183, 189-

91.)

50. Brodie, opined that Memphis Marine and Teco should not have performed the tow work inside the chute. He felt the chute was too crowded with barges and that working in the chute would create dangerous conditions that could allow the barges to break away. Brodie also testified that based upon his experience as fleet supervisor, it was not a good practice to permit the GIRLIE KNIGHT to back up into the chute under the conditions that existed on the night of November 15, 2002. He further testified that he overheard the radio communication between the GIRLIE KNIGHT and TOMMY ROSS at his home. However, despite his knowledge of the pending danger, Brodie did not take any action. He did not relay his concerns to the GIRLIE KNIGHT and TOMMY ROSS or instruct White to make sure that the fleet was secure after the GIRLIE KNIGHT left the area. (Pl.'s Proposed Finding of Facts 4; Tr. 109-113.)

51. There were no other vessels in the chute after the GIRLIE KNIGHT left and before the barges were reported adrift. (Ex. 29, p.15; Tr. 244, 248, Ex. 12 (logs of TOMMY ROSS for 11/15 and 11/16, 2002).)

52. At some point during the late evening of November 15, 2002, or the early morning of November 16, 2002, barges MEM 5122 and MEM 94157 broke away from their moorings and floated downstream. (Stipulation, Pretrial Order)

53. White received a radio report at approximately 1:40 a.m. on November 16, 2002, that the barges were adrift in the river. (Def.'s Proposed Finding of Fact 5; Tr. 183.)

54. White called Brodie, and they went out to recover the barges. They recovered the first barge about six miles away. (Tr. 43.) The others drifted further away. The broken lines were still on the barges. (Tr. 44.)

55.     As a result of the breakaway, barges MEM 5122 and MEM 94157 were returned back to Memco in a damaged condition. (Stipulation, Pretrial Order)

56.     A fair and reasonable amount of damages sustained by Memco as a result of the breakaway is $334,704.34. (Stipulation, Pretrial Order)

57.     Brodie testified that on November 16, 2002, the deck hand aboard the TOMMY ROSS, Steven Gray, told him that the GIRLIE KNIGHT left the chute full ahead. (Tr. 123.)

58.     Following the barge breakaway, George Leavell, the vice-president of Wepfer, instructed Brodie to take possession of the lock lines that had been used to moor the barges and retain those lines in his custody and control. (Teco's Proposed Finding of Facts 18.) Brodie brought home the two lock lines and placed them in a shed on his property. (Id. at 19.) Brodie quit working for Wepfer sometime in April 2003, and subsequently tore down the shed containing the shorelines. Brodie testified that he had "no idea what happened to the lines." ( Id.)

59.     Neither Leavell nor any representative of Wepfer attempted to take possession and retain custody over the leaving lines or mooring lines. (Teco's Proposed Finding of Facts 18.)

60.     Due to their being "lost," Wepfer could not produce the lock lines for inspection during the course of litigation. (Id.)

### III.  CONCLUSIONS OF LAW

As a fleeter, Wepfer is in the business of fleeting and mooring barges for hire.  A fleeter is a bailee, and has the duty to exercise due care in protecting the bailed property. Comerica Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110 (1941).  The failure to redeliver the goods in the same order and condition creates a prima facie case of liability against the bailee. Latin American Property & Casualty Ins. Co. v. Hi-Lift Marina, Inc., 677 F.Supp. 1156, 1159 (S.D. Fla.

1988), vacated, 877 F.2d 1477 (11th Cir. 1989). Due to the bailment relationship, Memco alleges that Wepfer is liable for its damaged barges. However, Wepfer alleges that third-party defendants Teco and Memphis Marine are responsible for the barge break away that caused Memco's damage, and thus they should be held liable. Although, the break away of a fleet from its moorings creates a rebuttable presumption that the fleeter's negligence caused the breakaway, Columbia Marine Service, Inc. v. Dravo Mechling Corp., 655 F. Supp. 689, 690 (S.D. Ohio 1987), Wepfer can rebut this presumption by showing either (1) that it used due care under the circumstances or (2) that the break away was the result of third-party negligence by Teco and Memphis Marine.

### A.  Wepfer's Due Care Under the Circumstances

Wepfer argues that it used due care in securing Memco's barges on November 15, 2002. A fleetor's duty of due care requires a watchman to watch over and periodically inspect barges in the fleet. Federal Barge Lines, Inc. v. Star Towing Co., 263 F.Supp. 981, 984 (E.D. La. 1967) A fleeter is also required to exercise due care by adequately mooring vessels in a fleet. Columbia Marine Services, Inc., v. Dravo Mechling Corp., 655 F.Supp. 689, 691 (S.D. Ohio 1987). If the barges are adequately moored, they will resist the ordinary and normal swells in narrow waters where vessel traffic may be anticipated. Some wheelwash from passing vessels is bound to occur, but it must be anticipated and guarded against by the fleet operator. New Orleans Steamboat Co. v. M/V HELLESPONT GLORY, 562 F.Supp 391, 393 (E.D. La. 1983). Finally, a fleeter has a continuing duty to inspect its fleet and take other appropriate measures as circumstances may dictate following the arrival and departure of vessels in its fleet. Columbia, 655 F.Supp. at 691. Based on the facts established at trial, this Court concludes that Wepfer failed to adequately exercise its duty of care for three reasons. First, it failed to take action with regard to the GIRLIE KNIGHT's tow work in

the chute. Second, Wepfer failed to keep an adequate watch over its fleet. And finally, the barges were inadequately moored.

Wepfer's fleet supervisor, Charles Brodie, testified that a boat the size of the GIRLIE KNIGHT should not have been allowed to back up into the Osceola chute under the conditions that existed on November 15, 2002 because Wepfer's fleet was too congested. Brodie, however, allowed this to occur despite hearing the communications between the GIRLIE KNIGHT and TOMMY ROSS indicating that they were going to do the tow work in the chute near his fleet. He did not get on the radio to tell them there were too many barges in his fleet, that it was too dangerous to do the work there, that they were working too close to his fleet, or to do the work elsewhere. Although Brodie believed the tow work was dangerous, he failed to take any preventative action, and only acted after receiving word that Memco's barges were adrift. Had Brodie been alarmed by the work taking place near his fleet, he should have, at the least, advised them to do the work elsewhere. Therefore, this Court concludes that Brodie's inaction demonstrates a breach of due care. See Columbia, 655 F. Supp. at 689 (holding that fleeter Columbia breached its duty of care because of the inaction of its dispatcher, who was "alarmed because he believed [a vessel] used too much power in departing," but he failed to take action until he received a radio message twenty-five minutes later that the fleet had broken loose.)

Next, White, a Wepfer deck hand, was on watch for the purpose of keeping an eye on the fleet. After the GIRLIE KNIGHT departed from the Osceola chute, White shined his spotlight where the barges that broke away were fleeted and did not see that any barges had broken loose. In fact, he saw nothing unusual. He does not recall shining the spotlight on the barges in question again that evening. However, the barges broke free sometime in the night or early morning. White

did not even know the barges had broken away until he was informed by radio between 1:40 a.m. and 2:00 a.m. by a line boat going down river. If White had been keeping an adequate watch, he would have had some idea of when or how the break away occurred. Hence Wepfer, through White, breached its duty of care.

Finally, third-party defendants Teco and Memphis Marine contend that Wepfer's barge lines were not adequately moored on the night in question. Captain Terry and steersman Watkins testified that they witnessed barges in the Wepfer fleet swinging out into the chute. Further, Captain Griggs observed the barges that broke away with only a single head line. Wepfer claims the barges were secured with a head line and stern line, but neither Brodie nor White recall mooring the barges in question. Brodie admitted that there were times when a head line and stern line were not used by Wepfer.

Additionally, Teco and Memphis Marine have accused Wepfer of spoliation of evidence, namely the remnants of the barge lines that broke. Negligent loss or destruction of evidence by a party gives rise to a rebuttable presumption, inferring that the missing evidence supports the opposing party's case. Welsh v. U.S., 844 F.2d 1239, 1248 (6th Cir. 1988); Clark Const. Co. v. City of Memphis, 229 F.R.D. 131 (W.D. Tenn. 2005). Wepfer was well aware of the evidentiary value of the lines as evidenced by Leavell asking Brodie to take them in his possession for safe keeping. Wepfer, by way of its employee Brodie, had exclusive control of this critical evidence, but failed to preserve it. No one from Wepfer made an effort to obtain the lines from Brodie when he quit his job with Wepfer. Failing to preserve the lines used to moor the barges involved in the breakaway creates a rebuttable adverse inference that the missing lines were inadequate to secure those barges. Although photographs of the lines were presented at trial, the Court finds the photos to be

insufficient evidence to rebut this adverse inference. Appropriately, this Court must find the barges were not adequately moored.

The defendant Wepfer relies on West India Fruit & S.S. Co. V. Raymond, 190 F.2d 673, 674 (5th Cir. 1951), which states that "the fact of injury to [a moored vessel] from swells prima facie establishes the liability of the [moving vessel]. Since the [GIRLIE KNIGHT] was the moving vessel, she must exonerate herself from blame by showing it was not in her power to prevent the injury by adopting any practical precautions." "Where a vessel is *properly* moored at a dock, at anchor, or not in motion, is damaged by a vessel in motion, the presumption of law is that it was the fault of the one under way. . ." The Rotherfield, 123 F. 460, 461 (S.D. Ala. 1903) (emphasis added).

Wepfer's reliance on this case law is misplaced. This Court does not reach the issue of whether the moving vessel is liable because Wepfer has failed to establish that the barges were *properly* moored. In fact, the evidence has demonstrated the contrary. Thus, Wepfer's attempt to shift its burden cannot succeed.

Taking these facts as a whole, this Court finds that Wepfer did not adequately meet its duty of care. Wepfer, did not investigate or take any action to inspect its fleet even though it now claims to have been concerned about the effects of the GIRLIE KNIGHT's departure. When White shined a spotlight on the mooring he found "nothing unusual." He failed to check the barges any more that night. There was no action on the part of Wepfer to secure its barges until the notification that barges were adrift. Further, the testimony about swinging barges, inadequate lines, and barges not being moored properly goes against Wepfer. Wepfer cannot rebut the presumption of negligence. Wepfer was responsible for ensuring that barges in their fleet were secured at all times. Its fleet personnel failed to properly inspect and attend to the barges and their moorings, which allowed the

barges to break away and drift down river. In light of these facts, Wepfer ultimately did not exercise due care under the circumstances.

### B. Alleged Negligence of Third-Party Defendants Teco and Memphis Marine

Wepfer can also rebut the presumption of negligence, or alternatively, decrease its liability, by establishing the negligence of third-party defendant's Teco and Memphis Marine. In <u>United States v. Reliable Transfer Co. Inc</u>., 421 U.S. 397, 411 (1975), the Supreme Court held that "when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault." Wepfer alleges that Memphis Marine was negligent in instructing the GIRLIE KNIGHT to enter the "congested" chute on the night in question. Wepfer also claims that the GIRLIE KNIGHT left the chute full ahead causing excess wheelwash in the chute which prompted the barges to move around and ultimately break away. This Court, however, after closely scrutinizing the TOMMY ROSS' and GIRLIE KNIGHT's operations in the chute on the evening of November 15, 2002, concludes that Teco and Memphis Marine a completely absolved from all liability.

It was the customary and usual practice of both Wepfer and Memphis Marine to allow large line boats to back into the chute and position themselves alongside the Island No. 30 bank in order to facilitate the fleet boats bringing barges to and building tow on the line boats. Both Wepfer and Memphis Marine routinely did tow work on line boats in the chute along Island No. 30 in the same location where the Memphis Marine vessel, the TOMMY ROSS, did tow work on the GIRLIE KNIGHT on November 15, 2002. No one had ever instructed Captain Griggs to refrain from doing tow work in that location, and there is no evidence suggesting that Memphis Marine was negligent

17

in allowing the work to take place in the chute on that evening.

Captain Terry testified that after the TOMMY ROSS put the barges in tow, the GIRLIE KNIGHT eased out of the chute with only its engines knuckled in, not throwing any wheelwash. Terry further testified that the boat was knuckled in until the boat got below the bottom of Island No. 30. Furthermore, subsequent to the GIRLIE KNIGHT's departure, Captain Griggs followed through with the "courtesy" practiced by both Wepfer and Memphis Marine, where he observed both fleets as he proceeded back to his dock to check whether there was any movement. Captain Griggs did not see any movement of any of the barges in either the Wepfer or Memphis Marine fleets following the GIRLIE KNIGHT's departure from Osceola.

The only evidence Wepfer offers to show that the GIRLIE KNIGHT negligently left the chute is that of Steven Gray, the deck hand aboard the TOMMY ROSS who told Brodie that the GIRLIE KNIGHT left the chute full ahead. This is not enough to establish third-party liability. See Columbia, at 690 (the only testimony that indicated the departing vessel might have used excessive power in leaving the fleet was the testimony of the dispatcher that the noise he heard when the vessel left made him think that it had departed the fleet at a faster than normal rate of speed. That was not enough to establish negligence of a third party.) This Court relies on the greater amount of testimony in trial, which is contrary to Gray's position. Based on the testimony and credibility of witnesses, the Court finds that Captain Terry and steersman Watkins did not fail to practice good seamanship in departing the fleet on November 15, 2002.

In conclusion, the Court finds that Wepfer is liable for the damages since it produced no evidence that the damage resulted from causes or circumstances other than its own negligence. Because the "law presumes a fleet breakaway results from the negligence of the fleeter," Columbia

at 690, and Wepfer has failed to overcome this presumption, Wepfer is held completely liable. See Columbia, at 690 (the District Court found fleeter Columbia 100% at fault for causing the barge breakaway.) Wepfer breached its duty of care, and failed to establish negligence on the part of third-party defendants Teco and Memphis Marine in leaving the fleet. Accordingly, Wepfer is 100% liable and is ordered to compensate Memco in full.

### C. Damages

The parties have stipulated that a fair and reasonable amount of damages is $334,704.34. However, the issue of pre-judgment interest is in dispute among the parties. Although Congress has enacted a statute governing the award of post-judgment interest in federal court litigation, see 28 U.S.C. § 1961, there is no comparable legislation regarding prejudgment interest.

Throughout our history, admiralty decrees have included provisions for pre-judgment interest. City of Milwaukee v. Cement Div., Nat. Gypsum Co. 515 U.S.189, 194 (1995). The essential rationale for awarding pre-judgment interest is to ensure that an injured party is fully compensated for its loss. Id. Pre-judgment interest is not awarded as a penalty; it is merely an element of just compensation. Id. at 197.

The Sixth Circuit Court of Appeals has held that the post-judgment interest rate contained in 28 U.S.C. § 1961 is a reasonable rate to be applied to awards of pre-judgment interest. Ford v. Uniroyal Pension Plan, 154 F.3d 613, 619 (6th Cir. 1998). In the case of Moore v. Baptist Memorial Health Care System, this Court held, based on Ford and other relevant authorities, that pre-judgment interest should be calculated based on the same rate contained in the post-judgment interest statute. (Memphis Marine's Proposed Finding of Facts 41.)

As statutorily mandated, such interest shall be calculated from the date of the entry of the

judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment., i.e., the week of September 15-22, 2006.  Memco will also be entitled to post-judgment interest from the date of judgment at the same specified percentage rate, compounded annually, and compounded to the date of payment.

The parties are instructed to calculate the pre-judgment interest accordingly and file a joint statement as to those figures with the court within fifteen (15) days.

## IV.  CONCLUSION

Based on the foregoing, the Court finds that Wepfer was negligent in the mooring of barges MEM 5122 and MEM 94157 and enters judgment accordingly.  Wepfer is ordered to compensate Memco in full.  Third-party defendants Teco and Memphis Marine are absolved from all liability.  Judgment is entered for **Plaintiff.**

**IT IS SO ORDERED** this 30th day of September, 2006.

s/Bernice Bouie Donald
BERNICE BOUIE DONALD
UNITED STATES DISTRICT COURT JUDGE